## ATCHISON, T. & S. F. R. Co. v. WILSON.

*(Circuit Court of Appeals, Eighth Circuit. October Term, 1891.)*

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE TRACKS.

While plaintiff's intestate and other railroad hands, engaged in reconstructing a piece of wrecked track, were removing wreckage by means of a derrick-car, the derrick unexpectedly swung to the north, and upset the car, and killed the intestate. The ground at the place of the accident was softened by prolonged rains, and there was evidence that immediately after the accident the north rail under the car was found to be several inches lower than the south rail, though there was no curve in the track, and that the consequent slant was sufficient to cause the derrick to swing as it did. Some witnesses testified that only three ties were laid under each rail; others that there were ten or twelve. *Held,* that such a slant of the track, whether due to careless construction or to the sinking of the north rail after it was laid, is such a defect as constitutes negligence on the part of the railroad company, and the question of its existence was properly submitted to the jury.

2. SAME—FELLOW-SERVANTS—VICE-PRINCIPAL.

The railroad company cannot escape liability for such negligence on the ground that it was the negligence of the intestate's fellow-servants, when the company's road-master was present, and in charge of the whole work of reconstruction.

3. DEATH BY WRONGFUL ACT—ACTION BY WIDOW—EVIDENCE—AGE OF OFFSPRING.
    In an action against a railroad company, brought under Rev. St. Mo. § 4425 *et seq.*,
    by a widow for the death of her husband while in its employ, evidence of the ages
    of the children of the marriage is admissible; for on his death the widow becomes
    responsible for the care of the children. *Tetherow* v. *Railway Co.*, 98 Mo. 84, 11
    S. W. Rep. 310, followed.

4. SAME—MEASURE OF DAMAGES—LOSS OF HUSBAND'S SOCIETY.
    But in such an action under that statute, the loss of companionship or society of
    the husband is not an element of damages, and it is error to instruct that the jury
    may consider such loss in estimating the damages. *Schaub* v. *Railway Co.*, (Mo.
    Sup.) 16 S. W. Rep. 924, followed.

In Error to the Circuit Court of the United States for the Eastern Judicial District of Missouri.

Action by Mary A. Wilson against the Atchison, Topeka & Santa Fe Railroad Company for the death of her husband, a section hand in defendant's employ. There was judgment for plaintiff, and defendant brings error.

*Gardiner Lathrop* and *Ben Eli Guthrie*, for plaintiff in error.

*B. R. Dysart* and *John F. Mitchell*, for defendant in error.

Present, CALDWELL, NELSON, and HALLETT, JJ.

HALLETT, J. In the month of April, 1890, a freight train was wrecked at or near Salt river, in Macon county, Mo., on a line of railroad owned and operated by the plaintiff in error. In the evening of the same day a large force of men was assembled at the wreck for the purpose of clearing the track and repairing it as speedily as possible. These men were employes of the company, of various occupations, collected from the line of the road. It was not the practice of the company to keep men for the business of removing wrecks, but in such an emergency men were called from all branches of the service as occasion might demand. For the most part they were section-men, and with them came the division superintendent of the road, William E. Costello, the road-master, Charles A. Lehman, and the train-master, William B. Scott. It is not clear whether any of these officers had general supervision of the entire force and of all the work to be done at that time and place; and, in the view we take of the case, it is not important to determine that question. It is enough to note the fact, clearly established by the evidence, that in repairing the track, or reconstructing it in a manner to be presently noticed, the work was under the supervision of the road-master, Charles A. Lehman, who was present and attending to that duty. Circumstances were not favorable to the work in hand. Rain had been falling for several days, and was still falling, and the ground was very wet, soft, and muddy. The work could not be completed in daylight, and it was necessary to carry it on through the night, with the aid of lanterns and bonfires, as might be possible under a wet sky. The place of the wreck was a high embankment or fill, 20 feet or more above the level of the adjacent land, and the borrow-pits below held more or less water. The width of the embankment was not much greater than the track, so that there was not much room for building a temporary track around the wreckage, or removing the old track to accomplish the same thing. The general course

of the road at that place is east and west, and about 180 feet of track west of the bridge over Salt river was displaced and torn up. Upon looking over the ground, and considering the work to be done, Lehman decided to move the track two feet south of its original position on the embankment. In doing this, part of the wreckage would be avoided, and the remainder would have to be removed as the work·progressed. To this work Lehman appointed Eaton, foreman of section 14, and gave his personal attention to other matters; but he says he returned twice or three times during the night "to see how the track was being repaired, and if everything was safe." The work of relaying the track in this manner was carried on through the greater part of the night, until at length some trucks from a freight-car were found lying across the north rail of the original track, which it was necessary to remove. After several unsuccessful efforts to remove them, Costello, division superintendent, came upon the ground and suggested to McCormick the use of the derrick or wrecking-car. McCormick had been trying to remove the trucks by means of a cable attached to a locomotive, and with men using crow-bars and possibly other appliances. He described himself as "car-repairer and wrecker-inspector," and he had been for some time in charge of the derrick or wrecking-car used on this occasion. More than any other person on the ground he seems to have had some special duties, in connection with his car, in the removal of wrecks; but he had not, so far as shown in this record, more than one man in his charge, and up to that time, on this occasion, he had worked with his own hands in common with other employes of the company. He was superior to the others only in his knowledge of the use of the wrecking-car, and in having charge of it when it was in action. McCormick assented to the use of the wrecking-car, and it was brought up for the purpose of removing the trucks. It then stood on the last rails of the new track laid by Eaton, which at this point were about 12 or 15 inches south of the rails of the old track. The trucks which were to be removed were partly on the northerly side of the new and old tracks, but in front of the wrecking-car. The plan was to raise them sufficiently so that they could be moved south of both tracks when suspended on the swinging boom of the derrick. For that purpose several men were called to assist McCormick in pushing the trucks to the south, when they should be lifted above the tracks with the aid of the derrick. Other men mounted the car, by Costello's command, for the purpose of working the derrick, and in due time the trucks were elevated above the tracks, as was proposed. But, contrary to all expectation, McCormick and the men who had hold of the trucks were unable to control them, and the trucks went north rather than south; the wrecking-car was overturned; and James W. Wilson, one of the men employed in working the derrick, fell under the trucks of that car and was killed. Wilson was a sectionman from section 14, and his foreman was Asbury Eaton. This action was brought by his widow, upon a statute of the state of Missouri, (Rev. St. § 4425 et seq.,) to recover damages resulting to her from his death, and she had judgment in the circuit court.

Referring, now, to the acts of negligence charged in the complaint, and the evidence at the trial on that subject, the prominent question of fact in the case is the condition of the new track on which the wrecking-car stood at the time of the casualty, and whether it was well built. Several witnesses testify that immediately after the car was overturned the north rail was observed to be two to four inches lower than the south rail, and those who deny the statement seem not to have given much attention to the matter. If such was the fact, it may have been due to carelessness in construction in placing the rails in that position, or to the sinking of the north rail under the weight of the wrecking-car.' In the latter case, the result would indicate that the rails were not adequately supported by ties. One witness testifies that only three ties were laid under each rail; others say four to six were laid; and still others give varying numbers, up to ten or twelve.

Whether the north rail was first laid lower than the other, or sunk in the mud under the wrecking-car, if in fact it was lower than the other immediately after the casualty, it was obviously a fault in construction. The track was straight at that point, and therefore there was no reason for placing one rail higher than the other, as is usual on curves. It is to be observed, also, that the new track was not intended for temporary use in removing the wreckage only, but was for the general traffic of the road during the following day, and perhaps longer. Under all the circumstances prevailing at the time, the duty of the company to restore the track as speedily as possible, and for that purpose to go on with the work at night, through rain and mud, no one will contend that the company should be held to the same care in building its track as would be demanded under more favorable conditions. Nevertheless, some care was necessary to make a track adequate to the support and safe passage of trains, not alone in the interest of the public, who were using the road extensively, but also in the interest of the employes of the company who should be sent over the road. With certain well-understood qualifications, which it is not necessary to define in this connection, a servant is as fully entitled to a safe track as any traveler over the road. If the track was in fact defective, and by the use of more ties or in any other way it could have been made safe for the wrecking-car, the duty of the company in that regard is clear and unmistakable. It seems to be conceded that the north rail, being lower than the other, would operate to deflect the load on the derrick in the manner and to the extent which actually occurred; so that it was a material question for the jury to consider whether the north rail of the new track was first placed lower than the south rail, or, not being so placed, whether it sunk under the wrecking-car, and thus caused the load on the derrick to swing to the north and overturn the car.

But, if this be allowed, we are urged to declare that the new track was laid by fellow-servants of Wilson, for whose negligent acts the company cannot be charged at the suit of one of their number. But our vision is not so limited, since we are bound to find the directing mind of the company, and that is a matter of no embarrassment in this instance.

The road-master, who, by the title and proper function of his office, had full authority over the track and the manner of building it, was there in person, and, as he says, vigilant and active in the discharge of his duties. No other officer could represent the company better or more fully in the matter of constructing the track, and the company could not do the work at all unless by the agency of a natural person. We are therefore authorized to say that the company was present in such form and degree as is possible to a corporation, when this track was laid, within the principle declared in *Railway Co.* v. *Ross*, 112 U. S. 377, 5 Sup. Ct. Rep. 184, and thus became responsible for all that was done or omitted at that time.

The circuit court did not err in declining to instruct for plaintiff in error, or in submitting to the jury upon the evidence the issue as to the condition of the railway track as the probable cause of Wilson's death.

As to the issue upon the use of the wrecking-car, the writer holds that it was improperly submitted to the jury, and that the fifth instruction asked by plaintiff in error ought to have been given by the court. But this court is unable to agree on this proposition, and declines to express an opinion upon it.

Two other questions, affecting the measure of damages, are presented in the record, upon which we have sought only to ascertain what construction has been given to the statute by the supreme court of Missouri. The first arises out of the admission of testimony as to the number and ages of Mrs. Wilson's children. When it was learned that the children were of an age to support themselves, the testimony was abandoned by counsel for plaintiff below. But it was not withdrawn from the jury, and counsel for plaintiff in error insist that it had weight with that body. If so, the supreme court of the state has held that, in an action by a wife for the death of her husband, such evidence may be received, for the reason that on the death of the husband she becomes responsible for the care of the children. *Tetherow* v. *Railway Co.*, 98 Mo. 84, 11 S. W. Rep. 310. And this must be accepted in federal courts as the meaning of the statute on which the action is based.

Error is also assigned on the charge of the court that the jury might consider the loss which defendant in error sustained in consequence of being deprived of her husband's society. In two cases reported from the supreme court of Missouri before this action was tried, it was held that such damages were properly allowed in an action by a husband for an injury to his wife. *Blair* v. *Railroad Co.*, 89 Mo. 335, 1 S. W. Rep. 367; *Furnish* v. *Railway Co.*, 102 Mo. 669, 15 S. W. Rep. 315. In the absence of other expression from that court, it might well be assumed that the same rule would obtain in an action on the statute by husband or wife. Since this case was tried, however, an opinion of that court has been published which distinctly declares that, in an action on the statute by a wife for the death of her husband, nothing shall be allowed for loss of society. *Schaub* v. *Railway Co.*, (Mo. Sup.) 16 S. W. Rep. 924.

As already pointed out, the earlier cases were common-law actions for injuries to the wife, and it is not to be assumed that the last case is in

conflict with the others. On the authority of the *Schaub Case*, and because it seems to be in accord with the current of authority elsewhere, we feel bound to declare that the law of Missouri is and has been that, in an action on the statute of that state by a wife for the death of her husband, the loss of companionship or society of the husband is not an element of damages, and therefore there was error in the instruction mentioned. The judgment of the circuit court will be reversed, and the cause will be remanded for a new trial.